Filed 10/20/14  P. v. Pierce CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ROBERT DANZEL PIERCE,<br><br>    Defendant and Appellant. | F066214<br><br>(Super. Ct. No. F10902876)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Wayne R. Ellison, Judge.

Joshua G. Wilson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Raymond L. Brosterhous II, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Two threatening voice messages were left for two Fresno police officers on their telephones. Following a jury trial, defendant Robert Danzel Pierce was found guilty for making both of those criminal threats in violation of Penal Code section 422[1] (counts 1 & 5).[2] Defendant contends these convictions should be reversed because the evidence was insufficient to establish he was the person who left the threatening messages. We hold that substantial evidence supports the jury's verdicts in counts 1 and 5 establishing defendant violated section 422 and affirm the judgment.

---

[1] All statutory references are to the Penal Code unless otherwise noted.

In order to be found guilty of violating section 422, the evidence must show "'(1) that the defendant "willfully threaten[ed] to commit a crime which [would] result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement … [was] to be taken as a threat, even if there [was] no intent of actually carrying it out," (3) that the threat—which may be "made verbally, in writing, or by means of an electronic communication device"—was "on its face and under the circumstances in which it [was] made, … so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.'" (*In re George T.* (2004) 33 Cal.4th 620, 630, quoting *People v. Toledo* (2001) 26 Cal.4th 221, 227-228; § 422, subd. (a); see CALCRIM No. 1300.) "'Electronic communication device' includes, but is not limited to, telephones, cellular telephones, computers, video recorders, fax machines, or pagers. 'Electronic communication' has the same meaning as the term defined in Subsection 12 of Section 2510 of Title 18 of the United States Code." (§ 422, subd. (c).)

[2] As to a different Fresno police officer, defendant was found not guilty of criminal threats under section 422 (count 2) and not guilty of resisting under section 69 (count 3). He was found guilty of possession of an assault weapon in violation of section 12280, subdivision (b) (count 4), which is not challenged in the present appeal. (§ 12280, subd. (b), was renumbered as § 30605, subd. (a), operative Jan. 1, 2012, without substantive change. Defendant was charged under the former section.)

# BACKGROUND

## I. Prosecution evidence

### A. Officer Craig Howard—Count 1

Fresno police officer Craig Howard was off duty and at home on May 18, 2010, when he received a message left on his personal cellular telephone. The message was left from a blocked number and it stated, "I'm going to take out as many of you mother fuckers as I fucking want. Fuck you[,] FPD[,] I'm going [*sic*] fucking kill as many of you mother fuckers as I want." Howard did not recognize the voice and he had neither a telephone number nor a name to associate with the voice mail.

Howard took the threats seriously and believed the threat would be carried out because he had "no clue" who left the message. He took steps to protect himself and his family, such as making sure his house was locked, placing guns in various places in his home that he could get to quickly if needed, and directing his children to go behind a car if a vehicle that they did not recognize came into their cul-de-sac. Howard also started to carry a gun when he mowed the lawn.

Howard had no prior relationship or contact with defendant.

### B. Officer Michael Hernandez—Count 5

Fresno police officer Michael Hernandez was working on May 1, 2010, when he received a voice mail message left on his department-issued phone system. The message stated, "You're dead[,] mother fucker[.] I'm going to kill your family. I'm going to kill your kids. I'm going to kill you [*sic*] wife. Take that suck it in[,] you Bastard." Hernandez did not recognize the voice. Neither a name nor a telephone number was left with the message and the system did not have a caller ID associated with the voice mail.

Hernandez took the threat seriously because it "came out of the blue" and because it threatened not only him, but also his wife and children. The voice message left him in fear for his safety and the safety of his family. He took steps to protect himself: he started carrying an off-duty weapon at all times; he installed an alarm system with a panic

3.

button at home for his family; he activated the GPS on his wife's and children's cellular telephones, which synced to his telephone; he was more cautious at work and at home and while traveling between the two locations.

Hernandez had never arrested defendant and did not have any prior relationship with him.

### C.  Detective George Imirian

Fresno police detective George Imirian was assigned to investigate the threats made to Howard and Hernandez. Imirian reviewed the audio recordings of both messages and obtained a search warrant for defendant at his residence on Fedora Avenue in Fresno, California.

On May 27, 2010, the Fresno Police Department executed the search warrant at defendant's residence. Imirian was the lead investigator when the search warrant was executed and he wore a load-bearing vest that said "Police" on it.

Defendant's mother answered the door when the police knocked, and she was informed a warrant was being served. While the police talked with his mother, defendant came out of the garage and angrily said, "Can't you see the fucking sign?" as he pointed to a little placard on the gate that said "Beware of dog." Imirian informed defendant he had a search warrant and he walked defendant out onto the front lawn to explain it. Imirian told defendant he was there investigating threats made to police officers from defendant's cell phone and Imirian also recited that number to him. In response, defendant smiled and said, "You're here for that? Fuck you, pig. This is America, and I can say whatever I want." Defendant then clenched his fist while standing on the front lawn. Police handcuffed defendant, but gave him the option to leave. They told him that, if he wanted to stay, he had to stay in handcuffs. Defendant elected to stay.

Defendant was living inside a "Tuff Shed" in the garage. Imirian had detective Scholl watch defendant while police conducted a search of that shed, defendant's residence.

4.

Imirian located a cell phone during the search of the Tuff Shed. He dialed the number he previously recited to defendant and the cell phone rang.

Police also searched defendant's truck and found scanner codes for police scanners, which would allow him to listen to a particular police department, such as Clovis or Fresno. A police scanner was located mounted to the side of the Tuff Shed, which was "on" and tuned to Imirian's specific channel. Imirian keyed up his police radio and he could hear himself talking on defendant's scanner.[3]

Imirian listened to defendant's voice during the course of executing the search warrant. Imirian testified the voice heard on the messages sounded like defendant's voice, but when asked if it was fair to say he was not 100 percent sure, he said, "No, of course not." Imirian had never spoken with defendant prior to execution of the search warrant.

On cross-examination, Imirian admitted he did not have any police training on voiceprint analysis and he agreed he was not an expert on that subject. Imirian also clarified he did not say the voices from the messages and defendant's "were the same" but that they sounded "very similar." Regarding the similarity of defendant's voice with the recorded messages, Imirian testified that "coupled with the evidence that we recovered linking his cell phone and his cell phone being found in his Tuff Shed, totality of it, I concluded, yeah, it was similar."

---

[3] The police scanner would have allowed defendant to listen to law enforcement radio traffic, such as dispatch calls for service, officers "running" individuals or vehicles, and, occasionally, officers giving personal information like their cell phone numbers over the radio, a practice which the Fresno Police Department changed after this incident. There was, however, no evidence either Howard or Hernandez broadcasted their cell phone numbers over the police scanner.

**D.**     **Detective Mike Scholl**

Detective Mike Scholl participated in the execution of the search warrant on defendant's property and stayed with defendant after he was placed in handcuffs.  As the police executed the warrant, defendant was very angry and agitated.  Defendant informed Scholl he had attended the Fresno police academy in 1991 and, "That's when I learned about you motherfuckers.  Once I learned what you were like, I decided against it.  You guys are corrupt, and the whole system is going to fall."  Defendant's mother approached, told him he should quiet down and defendant said, "Kim did this.  I know it.  She called the cops.  That's okay.  She's going to get it.  She's going to get it now."  Scholl learned from defendant's mother that Kim was defendant's ex-girlfriend.

Defendant later said, "You guys are tearing my stuff up over a threatening phone call?  You want a threat?  Maybe I'll shoot you."

## DISCUSSION

Defendant does not challenge whether criminal threats in violation of section 422 occurred.  He concedes his behavior during the execution of the search warrant might cause a jury to conclude he was capable of making threats, but he argues the evidence was insufficient to establish he was the person who left the threatening messages.

We "'"review the whole record in the light most favorable to the judgment [below] to determine whether it discloses substantial evidence—that is, evidence [that] is reasonable, credible, and of solid value—[from which] a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."'"  (*People v. Jones* (2013) 57 Cal.4th 899, 960, quoting *People v. Johnson* (1980) 26 Cal.3d 557, 578.)  The relevant question is not whether we believe the evidence at trial established guilt beyond a reasonable doubt, but rather "'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  (*People v. Johnson, supra,* 26 Cal.3d at p. 576, italics omitted.)  We are to "'"'presume in support of the

6.

judgment the existence of every fact the trier could reasonably deduce from the evidence.'" [Citation.]'" (*People v. Clark* (2011) 52 Cal.4th 856, 943, quoting *People v. Davis* (1995) 10 Cal.4th 463, 509.)

Defendant claims Imirian's testimony was "equivocal" regarding the identification. He argues Imirian used the "'totality'" of the circumstances to support his voice identification and not just the "pure similarity" of the voices on the recordings compared to defendant's voice. He points out that he never testified and did not speak in front of the jury, so the jury could not compare the voice mail messages with his voice. He contends the jury was never shown how Imirian identified him in the first place or why Imirian obtained a search warrant for his residence. Defendant urges Imirian's voice identification cannot be given any weight without the underlying facts upon which it was based. He maintains no evidence tied his cell phone to the threatening messages. Finally, he argues his statements during the execution of the search warrant did not rise to the level of a confession; that, at most, they could be characterized as an admission and, as such, were insufficient to support the convictions.

## A.    <u>Imirian's testimony regarding identification.</u>

It is the trier of fact who makes credibility determinations and resolves factual disputes. (*People v. Estrella* (1995) 31 Cal.App.4th 716, 724-725.) An appellate court will not substitute its evaluation of a witness's credibility for that of the fact finder. (*People v. Smith* (2005) 37 Cal.4th 733, 739, citing *People v. Jones* (1990) 51 Cal.3d 294, 314.) When a jury believes a witness's statements, those statements will not be rejected on appeal unless a physical impossibility exists that they are true, or their falsity is apparent without resorting to inferences or deductions. (*People v. Friend* (2009) 47 Cal.4th 1, 41; *People v. Barnes* (1986) 42 Cal.3d 284, 306.)

Here, it is clear the jury found Imirian's testimony credible and used his testimony to identify defendant as the person who left the threatening messages. It was the jury's responsibility to assess the credibility of this testimony. We will not substitute our

7.

evaluation of Imirian's credibility for that of the jury even though Imirian was equivocal about the voice identification and he based his opinion on the "totality" of the information he had. We will not disturb the jury's finding because Imirian listened to the audio recordings of both messages and also listened to defendant's voice during the course of executing the search warrant. (*People v. Gonzales* (1968) 68 Cal.2d 467, 472 [police officer's lack of positiveness regarding the defendant's identity goes to weight and not to competency of evidence].) Imirian's testimony will not be rejected on appeal because it had no apparent falsity without resorting to inferences or deductions. (*People v. Friend, supra,* 47 Cal.4th at p. 41.)

Further, it is immaterial that Imirian admitted he had no special training in voice print analysis and was not an expert on this subject as defendant asserts because Imirian's opinion as a lay witness was rationally based on his perception and was helpful to a clear understanding of his testimony. (Evid. Code, § 800; *People v. Farnam* (2002) 28 Cal.4th 107, 153.) It was permissible for the jury to use Imirian's testimony, and his testimony alone, to resolve whether defendant's voice matched the voices on the threatening messages. (*People v. Richardson* (2008) 43 Cal.4th 959, 1030-1031 [testimony of a single witness is sufficient for proof of any fact]; CALJIC No. 2.27.)

**B.      Evidence linking defendant's cell phone to the threatening messages.**

Circumstantial evidence may be sufficient to connect a defendant with a crime and prove his guilt beyond a reasonable doubt. (*People v. Abilez* (2007) 41 Cal.4th 472, 504; *People v. Jones, supra,* 57 Cal.4th at pp. 960-961.) Substantial evidence is used to determine the sufficiency of an identification to support a conviction. (*People v. Cuevas* (1995) 12 Cal.4th 252, 257.) Both the probative value of the identification and whatever other evidence is in the record are considered together to determine whether the jury could find the elements of the crime proven beyond a reasonable doubt. (*Id.* at p. 274.)

Imirian testified they had recovered evidence "linking [defendant's] cell phone." When Imirian first made contact with defendant, he informed defendant he was

investigating threats made to police officers from defendant's cell phone and recited the number to him. Imirian located a cell phone at defendant's residence, dialed the number he had for defendant's cell phone, and the recovered cell phone rang.

Based on this testimony, it is reasonable the jury could deduce Imirian linked defendant's cell phone to the threatening messages through his normal police work prior to obtaining the search warrant. (*People v. Clark, supra,* 52 Cal.4th at p. 943 [appellate court is to presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence].) Imirian's testimony tied defendant's cell phone to the threatening messages and it was further circumstantial evidence linking defendant to the crimes.

## C.   Defendant's admissions.

After Imirian told defendant he was investigating threats made to police officers from defendant's cell phone, and he recited the number, defendant smiled and said, "You're here for that? Fuck you, pig. This is America, and I can say whatever I want." Later, while police executed the search warrant, defendant said to Scholl, "You guys are tearing my stuff up over a threatening phone call? You want a threat? Maybe I'll shoot you." Defendant contends these statements were not a confession and, to the extent they were admissions, they were not sufficient to support the convictions.

The distinction between a confession and an admission is that a confession is a statement "'which, if true, discloses … [defendant's] guilt of that crime and excludes the possibility of a reasonable inference to the contrary'" while an admission is a declaration which, "'by itself, is not sufficient, even if true, to warrant an inference of guilt, but which tends to prove guilt when considered with the rest of the evidence.'" (*People v. Fitzgerald* (1961) 56 Cal.2d 855, 861.) Defendant's statements to police were admissions because they were declarations "'which tend[] to prove guilt when considered with the rest of the evidence.'" (*Ibid.*)

A jury may consider a criminal defendant's statements so long as "'the modicum of necessary independent evidence of the corpus delicti'" is present.  (*People v. Valencia* (2008) 43 Cal.4th 268, 297, quoting *People v. Alvarez* (2002) 27 Cal.4th 1161, 1181.) The corpus delicti rule requires some evidence that a crime occurred, independent of the defendant's statements, but the identity of the person who committed the crime is not part of the corpus delicti.  (*People v. Ledesma* (2006) 39 Cal.4th 641, 721.)  The level of evidence necessary to find independent proof of the corpus delicti is not great and, once done, "'the defendant's statements may be considered to strengthen the case on all issues.'"  (*Ibid.*, quoting *People v. Alvarez, supra,* 27 Cal.4th at p. 1181.)  The jury may then use the defendant's statements to identify him or her as the person who committed the crime if that is at issue.  (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1429; CALJIC No. 2.72.)

Here, there was independent evidence the criminal threats occurred apart from defendant's statements to police.  As such, the jury could use defendant's admissions to identify him as the person who committed the crimes.  (*People v. Rivas, supra,* 214 Cal.App.4th at p. 1429; *People v. Alvarez, supra,* 27 Cal.4th at p. 1181 [a defendant's statement may be considered to strengthen the case on all issues].)

Defendant contends his statement to Imirian shows no more than defendant's anger his home would be searched over messages.  He also argues that his statement to Scholl occurred after defendant was told police were conducting a search over threatening phone calls.  However, defendant's admissions also support a reasonable inference it was defendant who left the threatening messages.  Reversal of a judgment is not required merely because admissions can be interpreted more than one way.  (*People v. Abilez, supra,* 41 Cal.4th at p. 504 [the opinion of the reviewing court that circumstances might also reasonably be reconciled with a contrary finding of the jury does not warrant a reversal of judgment].)

A review of the entire record in the light most favorable to the judgment discloses substantial evidence defendant left the threatening voice messages for both Howard and Hernandez.  Imirian's opinion that defendant's voice was "very similar" to the voice heard on the threatening messages, coupled with evidence linking defendant's cell phone to the threatening messages, plus defendant's admissions constitute evidence that was reasonable, credible, and of solid value such that a reasonable jury could find defendant guilty beyond a reasonable doubt.  (*People v. Jones, supra,* 57 Cal.4th at p. 960; *People v. Johnson, supra,* 26 Cal.3d at p. 576.)

Accordingly, defendant's convictions of the crimes listed in counts 1 and 5 are affirmed.

## DISPOSITION

The judgment is affirmed.

_____
DETJEN, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
POOCHIGIAN, J.

11.