[S.F. No. 22808. In Bank. Oct. 20, 1971.]

GERALD ANDREW GALLIK, Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## COUNSEL

Tiernan & Nicoletti and Frank Nicoletti for Petitioner.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Derald E. Granberg, Edward P. O'Brien, Robert R. Granucci and Sanford Svetcov, Deputy Attorneys General, for Respondent and for Real Party in Interest.

## OPINION

**MOSK, J.**—Defendant Gerald Andrew Gallik, petitioner herein, was charged with possession of marijuana. (Health & Saf. Code, § 11530.) His motion to suppress the evidence on the ground of illegal search and seizure was denied, and he seeks review by statutory writ of mandate. (Pen. Code, § 1538.5, subd. (i).)[1]

The motion to suppress was heard on the transcript of the preliminary examination. At that examination the sole witness testifying to the events in question was San Jose Police Officer Roger Finton. Approximately 7:45

---

[1]The petition also prays for a writ of prohibition to review the denial of defendant's motion to set aside the information (Pen. Code, § 995). As to that relief, however, the petition is untimely in that it was filed in the appellate court more than 15 days after the order of denial (Pen. Code, § 999a).

p.m. on May 13, 1970, while it was still daylight, Officer Finton was on routine patrol duty in a marked police car, accompanied by a college student as an observer. In an unimproved area of San Jose the officer saw an automobile partially blocking one lane of a small dead-end street. Defendant, who was 19 years old at the time, was the driver and only occupant of the vehicle. He was talking with another young man and a girl, both standing with their bicycles on the passenger side of the car.

Officer Finton pulled up next to defendant's vehicle for the purpose of advising him it was illegally parked. As he alighted from his car the officer saw defendant lean forward, the top part of his body briefly bending down to the right.[2] Officer Finton approached the driver's side of the vehicle and told defendant he was illegally parked. Upon request, defendant produced his identification. The officer directed defendant to get out of the car and proceeded to pat him down for weapons, but found none. He also patted down the boy with whom defendant had been talking, but not the girl. Officer Finton then asked defendant "what he placed underneath the front seat," and defendant replied "Nothing, I didn't place anything." The officer nevertheless searched under the seat and brought out a brown leather bag. He opened it, and found inside a plastic "baggie" containing a small amount of marijuana.

On cross-examination Officer Finton admitted that as he approached defendant's vehicle he had no suspicion of crime: there were no circumstances that drew his attention to the vehicle other than its position in the street, and he had received no reports of unusual activities in the area. The officer conceded that even though he looked into the window he could not see defendant's arms during the time he bent forward, and did not in fact observe him placing anything under the seat. Further questioning established that Officer Finton undertook the search solely because defendant was, in the witness' words, "making the furtive movement"; he reiterated there were no other "suspicious circumstances" leading him to believe a crime was being committed in his presence. Asked the purpose of his search, the officer explained he was "looking for something" that defendant appeared to have placed beneath the seat; when pressed, the witness suggested "it could have been a gun or could have been some other type contraband."

The case is obviously controlled by our recent decision in *People* v. *Superior Court* (1970) 3 Cal.3d 807 [91 Cal.Rptr. 729, 478 P.2d 449] (hereinafter called *Kiefer*). There, the arresting officer stopped the defendants' car for speeding. As they pulled over to the side of the road, the passenger in the front seat appeared to look at the officer, then turned and bent forward

---

[2]The officer estimated the duration of the movement variously as "only a matter of a second" or "five seconds, two to five seconds."

briefly. The driver alighted and furnished his identification. The officer went to the door on the passenger side, opened it and looked inside, finding marijuana. He testified that his purpose in doing so was to see "what had been hidden," and added, "I was also concerned about my own safety." (*Id.* at p. 811.)

Upholding an order suppressing the marijuana on the ground of illegal search and seizure, we emphasized (1) the officer had no reliable information that the defendants' car contained contraband or was otherwise involved in criminal activity, and (2) he personally observed only the commission of the traffic offense and the assertedly "furtive gesture" of the passenger. We held that neither a traffic offense nor such a "furtive gesture" as there shown, without more, could reasonably give the officer probable cause to believe that either contraband or weapons were present in the defendants' car, and hence that his warrantless search thereof was unreasonable within the ambit of the Fourth Amendment to the United States Constitution.

We dismiss at the outset the Attorney General's suggestion that *Kiefer* is inapplicable because it assertedly declared "a new rule in California" and should therefore be given prospective effect only.[3] In *People* v. *Groves* (1969) 71 Cal.2d 1196, 1198 [80 Cal.Rptr. 745, 458 P.2d 985], we considered whether the decision in *People* v. *Sesslin* (1968) 68 Cal.2d 418, 422-425 [67 Cal.Rptr. 409, 439 P.2d 321], prescribing the factual allegations necessary to support an arrest warrant issued on information and belief, represented a substantial change in the law. We observed that *Sesslin* was itself predicated on five earlier decisions of the United States Supreme Court, and reasoned that "the *Sesslin* decision did not change the law. It was merely the first case in which this court was called upon to apply the foregoing decisions of the United States Supreme Court." We concluded (fn. 1) that "Since the *Sesslin* decision did not change the law, there is no merit in the Attorney General's contention that it should not apply to arrests made before the *Sesslin* case was decided."

By the same token, our decision in *Kiefer* did not "change the law" of probable cause. The guiding principle of *Kiefer* is that to constitute probable cause for an arrest or search, a "furtive gesture" such as a motorist's act of bending over inside his car must be invested with guilty significance either by specific information known to the officer or by additional suspicious circumstances observed by him. But *Kiefer* was not the source of this rule: as our opinion expressly pointed out (3 Cal.3d at pp. 818, 823-824, & fn. 10), the rule had been recognized in California at least as early as *People* v.

---

[3]The search in the case at bar took place on May 13, 1970. Our opinion in *Kiefer* was filed on December 31, 1970.

*Tyler* (1961) 193 Cal.App.2d 728, 732 [14 Cal.Rptr. 610], and had been correctly applied to an automobile search in both *People* v. *Moray* (1963) 222 Cal.App.2d 743 [35 Cal.Rptr. 432], and *People* v. *Cruz* (1968) 264 Cal.App.2d 437 [70 Cal.Rptr. 249]. *Kiefer* simply explained the origin and scope of the rule, and called a halt to its more egregious abuses; rather than declaring new law, we thus reaffirmed a settled principle which some intervening decisions of the Courts of Appeal had weakened by resting it on increasingly shakier factual foundations. (3 Cal.3d at pp. 818-828.) It follows that the *Kiefer* rule is not merely prospective in operation, but applies as well to searches conducted before *Kiefer* itself was handed down.[4]

 Turning to the facts of the present case, we hold that the minor differences between *Kiefer* and the record before us do not rise to the level of "suspicious circumstances" sufficient to invest defendant's movement with guilty significance.

---

[4]By resolving the issue in this manner, "we need not undertake the often-perilous task of applying to the facts of this case the test of 'retroactivity' developed in a well-known series of decisions of the United States Supreme Court" beginning with *Linkletter* v. *Walker* (1965) 381 U.S. 618 [14 L.Ed.2d 601, 85 S.Ct. 1731]. (*People* v. *Mutch* (1971) 4 Cal.3d 389, 394 [93 Cal.Rptr. 721, 482 P.2d 633].)

A more recent example of this approach is *Mozzetti* v. *Superior Court* (1971) 4 Cal. 3d 699 [94 Cal.Rptr. 412, 484 P.2d 84]. Like *Kiefer,* our purpose in *Mozzetti* was essentially prophylactic—i.e., to call a halt to the more egregious abuses of the authority of the police to "inventory" the contents ·of automobiles lawfully in their custody pursuant to the removal and storage provisions of the Vehicle Code. In so doing we held that an "inventory" of this kind is a search within the meaning of the Fourth Amendment; but that holding was expressly predicated (at pp. 704-705) on such earlier decisions as *Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868], *Camara* v. *Municipal Court* (1967) 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727], *People* v. *Williams* (1967) 67 Cal.2d 226 [60 Cal.Rptr. 472, 430 P.2d 30], and *People* v. *Grubb* (1965) 63 Cal.2d 614 [47 Cal.Rptr. 772, 408 P.2d 100]. In addition, we ruled that the asserted need to protect the motorist's personal property from loss and the police or storage bailee from unfounded claims does not constitute "exigent circumstances" justifying a warrantless inventory search, as there are reasonable alternatives which also protect the motorist's right of privacy. But a similar holding had been reached in *People* v. *Superior Court* (1969) 2 Cal.App.3d 304, 309-310 [82 Cal.Rptr. 766] (cited in *Mozzetti* at p. 703 of 4 Cal.3d), relying on the direct precedent of *Virgil* v. *Superior Court* (1968) 268 Cal.App.2d 127 [73 Cal.Rptr. 793]; and the general rule requiring exigent circumstances to justify the search of an immobilized vehicle without a warrant or probable cause, as we noted at page 706 of 4 Cal.3d, dates at least from *Preston* v. *United States* (1964) 376 U.S. 364 [11 L.Ed.2d 777, 84 S.Ct. 881], and *People* v. *Burke* (1964) 61 Cal.2d 575 [39 Cal.Rptr. 531, 394 P.2d 67]. Finally, we concluded that mere legal custody of an automobile by the police does not ipso facto create a new possessory right to search; but that conclusion was specifically drawn (at pp. 710-711) from such prior decisions as *Burke* and *Cooper* v. *California* (1967) 386 U.S. 58 [17 L.Ed.2d 730, 87 S.Ct. 788].

Accordingly, the *Mozzetti* rule, like *Kiefer,* does not represent a substantial change in the law and hence is not merely prospective in effect. (Accord, *People* v. *Heredia* (1971) 20 Cal.App.3d 194 [97 Cal.Rptr. 488].)

To begin with, it is immaterial that defendant's vehicle was standing rather than moving when the claimed "furtive gesture" took place: the majority of the innocent acts we hypothesized in *Kiefer* (3 Cal.3d at pp. 822-823) as resembling those of a person secreting contraband—such as reaching for a driver's license or registration, turning off the radio, extinguishing a cigarette, putting down food or beverages, or adjusting clothes— are equally likely to be performed when a police officer approaches an illegally parked car to speak with its driver.

Nor is it significant that Officer Finton asked defendant what he had placed under the seat and received a negative response: whether the motorist specifically answers "nothing" (*People* v. *Moray* (1963) *supra,* 222 Cal. App.2d 743, 744) or shrugs and remains mute (*People* v. *Cruz* (1968) *supra,* 264 Cal.App.2d 437, 439), the bare circumstance that he thus denies hiding anything does not ipso facto give the officer probable cause to believe the contrary. It is true that the officer in *Kiefer* "did not ask [the passenger] to explain the movement he had observed" (3 Cal.3d at p. 830); but as Justice Molinari correctly reasoned in his dissenting opinion prepared when the present case was before the Court of Appeal (*Gallik* v. *Superior Court* (Cal.App.) 93 Cal.Rptr. 332, hg. granted April 22, 1971), our remark does not imply "that the person to whom the inquiry is addressed is obliged to answer or that a negative reply in and of itself supplies circumstances giving the officer reasonable grounds to believe that weapons are present in the vehicle stopped for a traffic violation. The indication, rather, is that the *inquiry* is reasonable since it may produce a response which would allay the officer's suspicion based on the 'furtive' movement. Upon such inquiry the person questioned may elect to give an explanation of his 'furtive' movement or he may freely consent to a search. (See *People* v. *Cruz, supra,* 264 Cal.App.2d 437, 442.) He may, on the other hand, elect to stand on his constitutional right not to cooperate with the officers in securing evidence against him. In the latter situation the probable cause for the officer's search for either contraband or weapons in traffic violation cases must be predicated on specific facts and circumstances, other than a mere negative reply to the subject inquiry, which give reasonable grounds to believe that contraband or weapons are present in the vehicle the officer has stopped."[5]

Taking a different tack, the Attorney General seeks in a supplemental

---

[5]As we observed in a related context, "If refusal of permission to enter could convert mere suspicion of crime into probable cause to arrest the occupant and search his home, such suspicion alone would become the test of the right to enter, and the right to be free from unreasonable police intrusions would be vitiated by its mere assertion." (*Tompkins* v. *Superior Court* (1963) 59 Cal.2d 65, 68 [27 Cal.Rptr. 889, 378 P.2d 113].)

brief to justify Officer Finton's conduct as "a precautionary search for weapons." The point is devoid of merit.

We explained in *Kiefer* (at p. 829) that even when there is probable cause to arrest, a search for weapons must remain "reasonable in scope," and that "Just as the arresting officer in an ordinary traffic violation case cannot reasonably expect to find contraband in the offender's vehicle, so also he cannot expect to find weapons. To allow the police to routinely search for weapons in all such instances would likewise constitute an 'intolerable and unreasonable' intrusion into the privacy of the vast majority of peaceable citizens who travel by automobile. It follows that a warrantless search for weapons, like a search for contraband, must be predicated in traffic violation cases on specific facts or circumstances giving the officer reasonable grounds to believe that such weapons are present in the vehicle he has stopped."

We held in *Kiefer* that the requisite grounds are not furnished by the mere act of a motorist's bending down in his car when a police officer approaches, and that holding governs the case at bar. Moreover, here as in *Kiefer* (at p. 830) the defendant's car was stopped during daylight hours; the officer had received no reports of crimes or unusual activities in the area; the defendant was cooperative and produced his identification upon demand; and the officer's suggestion that he was looking for weapons came as an afterthought to his avowed purpose of searching generally for whatever might have been placed beneath the seat. (See also *People* v. *Hana* (1970) 7 Cal.App.3d 664, 669 [86 Cal.Rptr. 721].)

In a futile effort to avoid the thrust of *Kiefer* the Attorney General relies on two additional "facts and circumstances" he finds in this record; whether taken alone or together, however, they fail to furnish the missing probable cause.

First it is stressed that Officer Finton conducted a pat-down of defendant and the young man on the bicycle before searching the car. But this event shows at most the officer's concern that the suspect *might* be armed; it does not amount to evidence from which the officer could reasonably believe he *was* in fact armed. To hold otherwise would be to permit a police officer to create his own probable cause to search a vehicle simply by undertaking an unsuccessful pat-down of its occupants. Such a bootstrap operation is no more adequate for this purpose than the process, discussed above, of asking the motorist what he placed under the seat and then acting on a negative response.

Secondly, the Attorney General contends that because an "unarmed student observer" was riding in the patrol car Officer Finton was under a special duty to search for weapons if he entertained "any" suspicion of danger.

■ We do not wish to discourage law enforcement authorities from inviting, when appropriate, students or attorneys or other interested citizens to share in the experience of vehicular patrol, but they may not do so at the expense of the constitutional rights of suspects. Such an observer should be fully advised of the risks he incurs; and whatever precautions the officer may thereafter choose to take, the observer's presence cannot relieve the officer from the requirement of the Fourth Amendment that a warrantless weapons search of a traffic offender be predicated on specific facts giving reasonable cause to believe in the reality of the supposed danger. ■ For the reasons given above, no such facts are shown here.

We conclude that Officer Finton's search of defendant's car was unlawful, and the evidence discovered was therefore inadmissible. It follows that defendant is entitled to an order suppressing that evidence under the provisions of Penal Code section 1538.5.

The alternative writ of prohibition (Pen. Code, § 999a) is discharged. Let a peremptory writ of mandate suppressing the challenged evidence (Pen. Code, § 1538.5, subd. (i)) issue as prayed.

Wright, C. J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

**McCOMB, J.**—I dissent. I would deny the writ of mandate for the reasons expressed by Mr. Justice Sims in the opinion prepared by him for the Court of Appeal in *Gallik* v. *Superior Court* (Cal.App.) 93 Cal.Rptr. 332.

The petition of the real party in interest for a rehearing was denied November 18, 1971.